1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

11   JENINA D. MAZON,

12              Plaintiff,

13      v.

14   COMMISSIONER OF SOCIAL SECURITY,

15              Defendant.

16

17

Case No.  1:22-cv-00198-SAB

ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

(ECF Nos. 16, 17, 20)

18

19                                   **I.**

20                          **INTRODUCTION**

21          Plaintiff Jenina D. Mazon ("Plaintiff") seeks judicial review of a final decision of the

22   Commissioner of Social Security ("Commissioner" or "Defendant") denying her concurrently

23   submitted applications for Social Security benefits pursuant to Title II and Title XVI of the Social

24   Security Act.  Defendant submitted a cross-motion for summary judgment and opposition to

25   Plaintiff's brief.  The matter is currently before the Court on the parties' briefs, which were

26   submitted without oral argument, to Magistrate Judge Stanley A. Boone.[1]  For the reasons set

27   _____

28   [1]  The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to Magistrate Judge Stanley A. Boone for all purposes.  (ECF Nos. 7, 8, 9.)

forth below, Defendant's cross-motion shall be granted and Plaintiff's appeal shall be denied.

**II.**

**BACKGROUND**[2]

Plaintiff concurrently filed the instant applications for Social Security benefits under Title II and for Supplemental Security Income ("SSI") under Title XVI on October 17, 2019, alleging disability beginning November 1, 2017.  (See Admin. Rec. ("AR") 15, 241–51, ECF No. 11-1, 11-2.)  Plaintiff's claims were initially denied on January 16, 2020, and denied upon reconsideration on April 17, 2020.  (AR 76–77, 96–97.)  On February 17, 2021, Plaintiff, represented by counsel Harvey P. Sackett,[3] appeared via telephonic conference, for an administrative hearing before ALJ Regina Carpenter (the "ALJ").  (AR 33–75.)  Vocational expert ("VE") Lawrence Ostrowski also testified at the hearing.  On March 2, 2021, the ALJ issued a decision denying benefits.  (AR 12–32.)  On December 30, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (AR 1–6.)

Plaintiff initiated the instant action in federal court on February 16, 2022, and seeks judicial review of the denial of her applications for benefits.  (ECF No. 1.)  The Commissioner lodged the administrative record on May 4, 2022.  (ECF No. 11.)  On August 1, 2022, Plaintiff filed a motion for summary judgment.  (ECF No. 16.)  On September 6, 2022, Defendant filed a cross-motion for summary judgment and brief in opposition.  (ECF No. 17.)  Plaintiff filed a reply to Defendant's briefing on September 28, 2022.  (ECF No. 20.)  The matter is deemed submitted.

**III.**

**LEGAL STANDARD**

**A.    The Disability Standard**

To qualify for disability insurance benefits under the Social Security Act, a claimant must show she is unable "to engage in any substantial gainful activity by reason of any medically

---

[2] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.  However, the Court will refer to the parties' briefings by their ECF pagination.

[3] Mr. Sackett continues to represent Plaintiff in this instant appeal.  (See ECF No. 16.)

determinable physical or mental impairment[4] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520;[5] Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1?  If so, the claimant is disabled.  If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is on the claimant at steps one through four.  Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).  A claimant establishes a *prima facie* case of qualifying disability once she has carried the burden of proof from step one through step four.

Before making the step four determination, the ALJ first must determine the claimant's

---

[4] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

[5] The regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., and the regulations which apply to SSI benefits, 20 C.F.R. §§ 416.901 et seq., are generally the same for both types of benefits. Accordingly, while Plaintiff seeks both disability and SSI benefits in this case, to the extent cases cited herein may reference one or both sets of regulations, the Court notes the cases and regulations cited herein are applicable to the instant matter.

RFC.   20 C.F.R. § 416.920(e); <u>Nowden v. Berryhill</u>, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).   The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96-8p, <u>available at</u> 1996 WL 374184 (Jul. 2, 1996).[6]  A determination of RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  <u>See</u> 20 C.F.R. § 404.1527(d)(2) (RFC is not a medical opinion); 20 C.F.R. § 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."  <u>Vertigan v. Halter</u>, 260 F.3d 1044, 1049 (9th Cir. 2001).

At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform given her RFC, age, education, and work experience.  20 C.F.R. § 416.912(g); <u>Lounsburry v. Barnhart</u>, 468 F.3d 1111, 1114 (9th Cir. 2006).  To do this, the ALJ can use either the Medical Vocational Guidelines ("grids"), or call a VE.  <u>See</u> 20 C.F.R. § 404 Subpt. P, App. 2; <u>Lounsburry</u>, 468 F.3d at 1114; <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001).  "Throughout the five-step evaluation, the ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.' " <u>Ford</u>, 950 F.3d at 1149 (quoting <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995)).

**B.      Standard of Review**

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In determining whether to reverse an ALJ's decision, the Court reviews only those issues raised by the party challenging the decision.  <u>See Lewis v. Apfel</u>, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

---

[6] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner.  20 C.F.R. § 402.35(b)(1).  While SSRs do not have the force of law, the Court gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  <u>Han v. Bowen</u>, 882 F.2d 1453, 1457 (9th Cir. 1989); <u>see also Avenetti v. Barnhart</u>, 456 F.3d 1122, 1124 (9th Cir. 2006).

Further, the Court's review of the Commissioner's decision is a limited one; the Court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  42 U.S.C. § 405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  Thomas v. Barnhart (Thomas), 278 F.3d 947, 954 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)); see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).  "[T]he threshold for such evidentiary sufficiency is not high."  Biestek, 139 S. Ct. at 1154.  Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard."  Thomas v. CalPortland Co. (CalPortland), 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless.  Stout, 454 F.3d at 1055–56.  Moreover, the burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination."  Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  Nor may the Court affirm the ALJ on a ground upon which he did not rely; rather, the Court may review only the reasons stated by the ALJ in his decision.  Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).  Nonetheless, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  Ford, 950 F.3d at 1154 (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

///

///

5

**IV.**

**THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The ALJ conducted the five-step disability analysis and made the following findings of fact and conclusions of law as of the date of the decision, December 9, 2020 (AR 17–28):

At step one, the ALJ determined Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2022, and Plaintiff has not engaged in substantial gainful activity since November 1, 2017, the alleged onset date.  (AR 17 (citing 20 C.F.R. §§ 404.1571 et seq.; 20 C.F.R. §§ 416.971 et seq.).)

At step two, the ALJ determined Plaintiff has the following severe impairments: status posttraumatic brain injury and skull fracture and seizure disorder.  (Id. (citing 20 C.F.R. §§ 404.1520(c); 416.920(c)).)

The ALJ also noted Plaintiff was diagnosed with alcohol use disorder, in remission, but determined this was a nonsevere impairment because the record did not contain any evidence that Plaintiff's alcohol use has caused any limitations in the cognitive function areas.  (AR 18.)  However, the ALJ noted she considered any potential effects this impairment might cause or contribute in combination with Plaintiff's other impairments to the RFC.  (Id.)

At step three, the ALJ determined Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (AR 18–20 (citing 20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526; 416.920(d); 416.925; 416.926).)

In reaching this decision, the ALJ considered Plaintiff's severe physical impairments under the listings, including Listing 11.02 (epilepsy/seizure disorder), 11.18 (traumatic brain injury), and 12.02 (neurocognitive disorders), and determined the medical record did not document findings necessary to meet the criteria set forth under these listings.  (AR 18–19.)  As to Listing 12.02, the ALJ determined Plaintiff does not satisfy the paragraph B criteria because her mental impairments do not result in one extreme limitation or two marked limitations in a broad area of functioning.[7]  (AR 19–20.)  Instead, the ALJ determined Plaintiff has moderate

---

[7] The "paragraph B criteria" evaluates mental impairments in the context of four broad areas of functioning: (1)

limitations in the areas of "understanding, remembering or applying information" and "concentrating, persisting, or maintaining pace," and no limitations in the areas of "interacting with others" or "adapting or managing oneself."[8]  (Id.)  The ALJ also considered the paragraph C criteria and determined the record does not establish that Plaintiff's traumatic brain injury meets the criteria of the applicable mental disorder listings.  (AR 20.)

Before proceeding to step four, the ALJ determined Plaintiff has the RFC to perform:

> **a full range of work at all exertional levels but with the following nonexertional limitations: no climbing; no exposure to hazards such as dangerous moving machinery, unprotected heights or open bodies of water; can understand, remember and carry out simple tasks that can be learned in one month or less; no fast-paced production, such as assembly line or piecemeal production requirements; and no more than occasional changes in work routine or work setting.**

(AR 20–26 (citing 20 C.F.R. §§ 404.1529; 416.929; SSR 16-3p, available at 2017 WL 5180304 (Oct. 25, 2017)) (emphasis in original).)

At step four, the ALJ found Plaintiff is unable to perform any past relevant work.  (AR 26 (citing 20 C.F.R. §§ 404.1565; 416.965).)

At step five, the ALJ noted Plaintiff was born on June 26, 1984, and was 33 years old (which is defined as a younger individual age 18–49) on the alleged disability onset date; Plaintiff has at least a high school education; and transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferrable job skills.  (AR

---

[8] understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  The severity of the limitation a claimant has in each of the four areas of functioning is identified as either "no limitation," "mild," "moderate," "marked," or "extreme."  Id.  To satisfy the paragraph B criteria, a claimant must have an "extreme" limitation in at least one of the areas of mental functioning, or a "marked" limitation in at least two of the areas of mental functioning.  Id.  An "extreme" limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  Id.  A "marked" limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.  Id.  A "moderate" degree of mental limitation means that functioning in this area independently, appropriately, effectively, and on a sustained basis is "fair."  Id.

[8] It is perhaps also worth noting that, to the extent Plaintiff suggests any accounting for her moderately limiting impairments in the RFC would necessarily result in an ultimate finding of disability, such contention is unsupported in law.  See, e.g., Sandoval v. Berryhill, CIV 17-0641 JHR, 2018 WL 3429920 (D.N.M. Jul. 16, 2018), at *7 (noting only "marked" impairment prevents any interaction; whereas limitation of "moderate to marked" denotes "abilities in these areas are limited, [but] they are not completely absent.").

26–27 (citing 20 C.F.R. §§ 404.1563; 416.963; 404.1564; 416.964; 416.964; SSR 82-41, available at 1982 WL 31389 (Jan. 1, 1982); 20 C.F.R. Part 404, Subpart P, Appendix 2).) Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as:

- Counter Supply Worker (Dictionary of Occupational Titles ("DOT") 319.687-010), a medium exertion, unskilled work position with a specific vocational preparation ("SVP") level of 2, and approximately 170,000 jobs available in the national economy;

- Hospital Cleaner (DOT 323.687-010), a medium exertion, unskilled work position with an SVP level of 2, and approximately 340,000 jobs available in the national economy; and

- Linen Room Attendant (DOT 222.387-030), a medium exertion, unskilled work position with an SVP level of 2, and approximately 52,000 jobs available in the national economy.

(AR 27–28 (citing 20 C.F.R. §§ 404.1569; 404.1569(a); 416.969; 416.969(a); 20 C.F.R. Part 404, Subpart P, Appendix 2; SSR 83-11, available at 1983 WL 31252 (Jan. 1, 1983); SSR 83-12, available at 1983 WL 31253 (Jan. 1, 1983); SSR 83-14, available at 1983 WL 31254 (Jan. 1, 1983); SSR 85-15, available at 1985 WL 56857 (Jan. 1, 1985)).)  With respect to the identified jobs, the ALJ noted the VE's testimony was consistent with the DOT and, with respect to the specified RFC limitations, the VE's testimony was based on his professional experience.  (AR 27.)

Therefore, the ALJ found Plaintiff has not been under a disability, as defined in the Social Security Act, from November 1, 2017 through March 2, 2021 (the date of decision).  (AR 27–28 (citing 20 C.F.R. §§ 404.1520(g); 416.920(g)).)

## V.

## DISCUSSION

Plaintiff asserts three challenges on appeal: (1) the ALJ improperly addressed the medical opinions; (2) the ALJ improperly rejected Plaintiff's testimony; and (3) the ALJ's step five finding is not supported by substantial evidence.  (ECF No. 16-1 at 7.)

### A.    Evaluation of the Medical Opinion Evidence

Plaintiff argues the ALJ improperly discounted the medical opinion of her treating

neurologist, Dr. Stecker, while according too much weight to the opinion of Dr. Swanson.  (ECF No. 16-1 at 17–20.)   As a result, Plaintiff argues the RFC is not supported by substantial evidence.  The Court disagrees.

### 1.   Legal Standard

The RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite her limitations.  20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.945(a); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (RFC reflects current "physical and mental capabilities"); SSR 96-8p, at *2.  Thus, it represents the maximum amount of work the claimant is able to perform based on all the relevant evidence in the record.  See id.; see also 20 C.F.R. § 416.945(a)(3) (RFC determination must be "based on all of the relevant medical and other evidence.").  As previously noted, the RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  See 20 C.F.R. §§ 404.1527(d)(2), 404.1546(c); Vertigan, 260 F.3d at 1049 ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.") (citing 20 C.F.R. § 404.1545).  And where "the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict."  Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003); Batson, 359 F.3d at 1195; see also Lingenfelter v. Astrue, 504 F.3d 1028, 1042 (9th Cir. 2007) ("When evaluating the medical opinions of treating and examining physicians, the ALJ has discretion to weigh the value of each of the various reports, to resolve conflicts in the reports, and to determine which reports to credit and which to reject."); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999) (holding that ALJ was "responsible for resolving conflicts" and "internal inconsistencies" within doctor's reports); Tommasetti v. Astrue, 533 F.3d 1035, 1041–42 (9th Cir. 2008) ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").

In reviewing whether an ALJ committed error in determining the RFC, the relevant inquiry is whether the medical evidence supports the ALJ's finding.  Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173–74 (9th Cir. 2008) (holding the RFC assessment adequately captures restrictions if it is consistent with the concrete limitations in the medical opinions); see also

Schneider v. Comm'r, 433 Fed. Appx. 507, 509 (9th Cir. 2011) (ALJ's failure to address claimant's migraines was harmless because medical record did not support finding that migraines would affect claimant's functioning at work).  Accordingly, "[t]he ALJ's RFC determination need not precisely reflect any particular medical provider's assessment."  Althoff-Gromer v. Comm'r of Soc. Sec., No. 2:18-cv-00082-KJN, 2019 WL 1316710, at *13 (E.D. Cal. Mar. 22, 2019) (citing Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222–23 (9th Cir. 2010)); see also Chavez v. Colvin, 654 Fed. App'x 374, 375 (10th Cir. 2016).  This is because it is within the ALJ's province to synthesize the medical evidence.  See Lingenfelter, 504 F.3d at 1042.

Where, as here, a claim is filed after March 27, 2017, the revised Social Security Administration regulations apply to the ALJ's consideration of the medical evidence.  See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions), 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.  Under the updated regulations, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Thus, the new regulations require an ALJ to apply the same factors to all medical sources when considering medical opinions, and no longer mandate particularized procedures that the ALJ must follow in considering opinions from treating sources.  See 20 C.F.R. § 404.1520c(b) (the ALJ "is not required to articulate how [she] considered each medical opinion or prior administrative medical finding from one medical source individually."); Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017).

Instead, "[w]hen a medical source provides one or more medical opinions or prior administrative medical findings, [the ALJ] will consider those medical opinions or prior administrative medical findings from that medical source together using" the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; [and] (5) other factors that "tend to support or contradict a medical opinion or prior administrative medical finding."  20 C.F.R. §§ 404.1520c(a), (c)(1)–(5).  The most important factors to be applied in evaluating the persuasiveness of medical opinions and prior administrative medical findings are

supportability and consistency.  20 C.F.R. §§ 404.1520c(a), (b)(2).  Regarding the supportability factor, the regulation provides that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions … will be."  20 C.F.R. § 404.1520c(c)(1). Regarding the consistency factor, the "more consistent a medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be."  20 C.F.R. § 404.1520c(c)(2).

Accordingly, the ALJ must explain in his decision how persuasive she finds a medical opinion and/or a prior administrative medical finding based on these two factors.  20 C.F.R. § 404.1520c(b)(2).  The ALJ "may, but [is] not required to, explain how [she] considered the [other remaining factors]," except when deciding among differing yet equally persuasive opinions or findings on the same issue.  20 C.F.R. §§ 404.1520c(b)(2)–(3).  Further, the ALJ is "not required to articulate how [she] considered evidence from nonmedical sources."   20 C.F.R. § 404.1520c(d).  Nonetheless, even under the new regulatory framework, the Court still must determine whether the ALJ adequately explained how she considered the supportability and consistency factors relative to medical opinions and whether the reasons were free from legal error and supported by substantial evidence.  See Martinez V. v. Saul, No. CV 20-5675-KS, 2021 WL 1947238, at *3 (C.D. Cal. May 14, 2021).

2.    The ALJ's Evaluation of the Medical Opinion Evidence

a.    **Relevant Medical Records**

The record indicates Plaintiff was hospitalized on November 2, 2017, after an assault. (AR 23, 516).  Plaintiff was found with a hematoma on the back of her head and smelling of alcohol.  She also had a pulmonary embolism.  She was diagnosed with traumatic subdural hematoma with brain shift.  (AR 500, 509–12.)  Plaintiff underwent a craniectomy with hematoma evacuation and EVD placement, on November 4, 2017 (AR 406, 498, 910); a tracheostomy on November 14, 2017, at which time the EVD was removed (AR 497, 507, 515, 910); and a right cranioplasty with cranial bone remodeling surgery on December 1, 2017 (AR 497, 515, 848–49, 910).  She received comprehensive inpatient rehabilitation, including physical

therapy, occupational therapy, speech therapy, and recreational therapy.  (See AR 23, 373, 400, 403–13, 419–20, 424, 432–33, 455–56, 489–90, 910–51, 1248–52.)  She was discharged on December 15, 2017.  (AR 402)

Plaintiff had a follow up visit on December 18, 2017, at which she reported she was "doing well," denied any headaches, nausea, vomiting, changes in vision, weakness, or sensory changes, but had some anxiety.  (AR 400–01.)  She was scheduled to see a counselor.  It is unclear from the record whether she attended this appointment.

On May 29, 2018, Plaintiff was treated in regard to her pulmonary embolism.  (AR 397–98.)  At this time, Plaintiff denied any shortness of breath or chest pains and reported she was not taking any medications and was "otherwise healthy" and "very active."  (AR 399.)  Her examination was normal, and an ultrasound showed no evidence of deep vein thrombosis.  (AR 398.)  Plaintiff's IVC filter was removed in April 2019.  (AR 383–84, 956–59.)

In September 2019, Plaintiff was referred for an initial neurology consult to do neurocognitive testing in order to go back to work.  (AR 377–80.)  Plaintiff reported she was unsure of working again and felt depressed, but she declined any medications.  (AR 379.)  An examination yielded findings that Plaintiff was alert and oriented x 3, she was in no acute distress, her lungs were clear, she had 5/5 upper and lower extremity strength, and normal gait.  (AR 378.)  The neurologist reported Plaintiff had good recovery of the traumatic brain injury with no focal neurological deficits.  (AR 379.)  No cognitive test results are in the record.  In addition, Plaintiff later testified at the hearing that she did not recall have any formal neurocognitive testing completed.  (See AR 42–43.)  The doctor agreed to extend Plaintiff's EDD disability form (see AR 377) for two months, based on Plaintiff's reports of depression (determined to be the "main disability factor" for Plaintiff to return to work); however, the doctor had an "extensive discussion with [Plaintiff] regarding starting readjusting herself to [the] working experience" and Plaintiff was "highly encouraged" to start volunteering to get herself ready to go back to work.  (AR 379.)

Plaintiff filed her applications for social security benefits on October 17, 2019.

Plaintiff returned for another neurology consult in November 2019, reporting repetitive speech and short-term memory loss.  (AR 371.)  An examination was normal with no abnormal

neurological findings.  (AR 372–73.)  Plaintiff was referred for speech therapy; however, as noted by the ALJ, there is no evidence of Plaintiff attending speech therapy in the record; it was also recommended Plaintiff get neuropsych testing.  (See AR 23, 373.)  Imaging performed December 16, 2019, showed status post craniotomy with large area of encephalomalacia in the frontal lobes, no edema or hemorrhage, and mild mucosal thickening in the left sinus.  (AR 1210.)

Plaintiff attended a consultative examination in December 2019 with Dr. Steven C. Swanson, Ph.D.  (AR 1214–21.)  In January 2020, Drs. Kiger and Khan reviewed Plaintiff's initial Social Security applications and medical records and issued nondisabilty findings.  (AR 81–84, 87–95.)

On February 17, 2020, Plaintiff went to the emergency room for a seizure.  (AR 1223–27.) The seizure reportedly lasted for approximately one minute.  Plaintiff reported she had her first seizure three days before (AR 1225); however, the record shows an unremarkable workup including a head CT with no acute process (AR 1223).  Plaintiff was not taking any anti-epileptic medications prior to this incident.  Plaintiff was started on Keppra to help control any seizures until she could follow up with a neurologist, and was released in stable condition.  (AR 1225.)

The record indicates Plaintiff returned to the emergency room on February 24, 2020, complaining of a rash, nausea, and vomiting in reaction to the Keppra, but she denied any seizures.  (AR 1230.)  Other than the rash, an examination of Plaintiff yielded normal findings. (AR 1231.)  Plaintiff's Keppra dose was reduced from 500 mg (daily) to 250 mg and she was released to go home.  (AR 1232.)

On April 15, 2020, Plaintiff was treated in the emergency room for a second seizure.  (AR 1236–37.)  Plaintiff reported her seizure medication had recently been increased and she had some GI side effects, so she had decreased her dose of seizure medication on her own and then experienced a seizure later that night.  The seizure reportedly lasted four minutes.  Plaintiff reported she was much improved when she arrived at the emergency room; an examination yielded normal findings, other than some anxiety Plaintiff reported feeling due to coming to the emergency room during the COVID pandemic, but no other complaints.  She was not admitted.

On April 15 and 16, 2020, Drs. Tanaka and Moura reviewed Plaintiff's Social Security

application and medical records on reconsideration and affirmed the prior nondisability determination.  (AR 98–106, 109–16.)

On April 25, 2020, Plaintiff returned to the emergency room to report a third seizure.  (AR 1240–43.)  She reported she had had two seizures in 2020 and was started on lamictal after the second seizure.  Plaintiff reported she "has had some intermittent nausea and emesis for the last several months but none ongoing."  Her examination was otherwise normal and she was released to go home in stable condition.  (AR 1241–42.)  A head CT taken that day also yielded unremarkable results, with no acute changes and stable appearance of the brain as compared to a prior CT study from December 16, 2019.  (AR 1247.)

In June 2020, Plaintiff commenced physical therapy with initial reports of feeling off-balance and tripping when she walked.  (AR 1248–50.)  She attended seven sessions with reported improvement in balance and posture and reported that she jogged a half block.  (AR 1251–52.)  As of her final session, the physical therapist reported Plaintiff had improved her FGA score from 22/30 to 30/30 and met all therapy goals.  (AR 1251.)

On December 25, 2020, Dr. Stecker provided a medical source statement.  (AR 1254–57.)

Based on the medical record, the ALJ concluded Plaintiff had fully recovered from her prior injuries within twelve months.  (AR 25.)

**b.      State Agency Consultant Drs. Kiger, Khan, Tanaka, and Moura**

State agency physician Lydia Kiger, M.D., reviewed Plaintiff's records as of January 14, 2020.  She noted Plaintiff's head injury in 2017 and the subsequent follow up records, determined the record indicates Plaintiff has done well physically, and noted Plaintiff's recent exams are unremarkable.  Dr. Kiger opined Plaintiff's physical impairments were non-severe.  (AR 81–83, 91–92.)  Dr. S. Khan, M.D., reviewed Plaintiff's records as of January 16, 2020, and opined the totality of the records do not support any severe psych impairment and that Plaintiff's psychiatric symptoms do not significantly decrease/impact her ability to function.  (AR 83–84, 87–95.)

On reconsideration, Dr. Laurence Tanaka, M.D. reviewed Plaintiff's records as of April 15, 2020, and affirmed the physical medical decision.  (AR 98–103, 106, 109–13, 115–16.)  Dr. Barbara Moura, PsyD., reviewed Plaintiff's records as of April 16, 2020, and opined that Plaintiff

1    has all mild limitations in the functional areas under the paragraph B criteria; and affirmed the

2    findings that Plaintiff's psychiatric symptoms do not significantly decrease/impact her ability to

3    function.  (AR 103–05, 113–15.)

4        The ALJ found the prior administrative findings of the state agency medical consultants to

5    be not persuasive.  (AR 25.)  The ALJ noted the state agency doctors' opinions "are generally

6    supported by their explanations," but that they did not have the opportunity to review all of the

7    medical evidence of record, particularly Plaintiff's seizure disorder.  In considering Plaintiff's

8    seizures, "and in giving the claimant some benefit of the doubt as to some memory issues from

9    the traumatic brain injury," the ALJ instead determined Plaintiff's impairments warrant a

10   limitation to a range of unskilled and low stress work activity.

11        **c.**     **Dr. Steven C. Swanson, Ph.D., Consultative Examiner**

12        Dr. Swanson performed a consultative psychological assessment on December 30, 2019,

13   in which he administered a clinical interview, the Wechsler Adult Intelligence Scale-Fourth

14   Edition ("WAIS-IV"), the Wechsler Memory Scale-Fourth Edition ("WMS-IV"), and the Trail

15   Making Test ("TMT").  (AR 1214–21.)  During the interview, Plaintiff reported that she was

16   assaulted and had a traumatic brain injury and that she has not been able to return to work

17   because she is more forgetful and distractible since the traumatic brain injury.  Dr. Swanson noted

18   Plaintiff was oriented x 4 with a friendly and cooperative attitude and normal eye contact; her

19   speech was unremarkable, mood was euthymic, and affect was full range; her concentration was

20   adequate and form and thought content and short-term, recent, and remote memory were within

21   normal limits; and Plaintiff's general fund of knowledge fell within normal limits.  (AR 1215–

22   16.)  WAIS-IV testing yielded a Full Scale IQ ("FSIQ") score of 86, which falls within the low

23   average range of intellectual ability; no significant difference between the verbal comprehension

24   and perceptual reasoning results was noted.  (AR 1218.)  Dr. Swanson concluded from the test

25   results that Plaintiff can be expected to perform at a "somewhat lower" academic level than same-

26   aged peers.  The WMS-IV test scores were consistent with Plaintiff's intelligence test scores and

27   did not reveal any relative weakness in memory functioning.  Plaintiff's TMT test results indicate

28   her visual, conceptual, and visuomotor tracking skills fall within normal limits and Dr. Swanson

1   concluded the result "does not make a strong case for organicity." (AR 1218.)

2       Dr. Swanson opined that Plaintiff is "able to maintain concentration and relate

3   appropriately to others in a job setting.  She would be able to handle funds in her own best

4   interests.  She is expected to understand, carry out, and remember simple instructions.  She is

5   judged able to respond appropriately to usual work situations, such as attendance, safety, and the

6   like.  Changes in routine would not be very problematic for her.  There do not appear to be

7   substantial restrictions in daily activities.  Difficulties in maintaining social relationships do not

8   appear to be present." (AR 1219.)   The only diagnosis given was alcohol use disorder, in

9   remission. (AR 1218.)

10      The ALJ found Dr. Swanson's opinion somewhat persuasive, as it is consistent with the

11  claimant's reported activities of daily living in 2019 and her lack of mental health treatment.  (AR

12  25–26.)  However, the ALJ declined to fully adopt Dr. Swanson's opinion to the extent the ALJ

13  credited Plaintiff's testimony and the lay witness statements from Plaintiff's mother regarding

14  Plaintiff's allegations of memory issues, and instead "[gave Plaintiff] some benefit of the doubt in

15  finding a moderate limitation in [ability to] understand, remember, or apply information." (AR

16  26.)

17      **d.     Dr. Mark Stecker, Treating Neurologist**

18      On December 25, 2020, Dr. Stecker provided a "Physician's Medical Source Statement"

19  form questionnaire, in which he noted Plaintiff has treated with him since April 3, 2020, and been

20  seen by him every two months.  (AR 1254.)  Dr. Stecker diagnosed Plaintiff with seizures, head

21  injury, and subdural hematoma.  He checked the following boxes indicating Plaintiff's signs and

22  symptoms: depression, loss of interest in activities, emotional lability, easy distractibility, change

23  in personality, difficulty with concentration, and disturbance in mood.  He opined Plaintiff's

24  impairments resulted in disorientation to time and place.  He also checked a box indicating

25  Plaintiff's impairments have resulted in memory impairment; however, in the portion of the form

26  provided to specify whether the memory impairment is either short-term, intermediate, or long-

27  term and/or provide further explanation, Dr. Stecker left this portion of the form blank.  Dr.

28  Stecker noted Plaintiff experienced seizure patterns, alternations of awareness or loss of

consciousness, and episodes of unconventional behavior/significant interference with activity during the day more than once a week.  (AR 1255.)

The remainder of the form questionnaire contains specific questions and subsets of types of limitations that the medical professional is to opine as to the severity of, using a scale of severity from "none" to "marked."  (AR 1255–57.)  The first subset of limitation areas pertains to understanding, and memory.  The second subset pertains to sustained concentration, and persistence.  The third subset pertains to social interactions.  The fourth subset pertains to functional limitation.  According to the form, a "mild" limitation impairs the effective performance of the task incrementally for a total of somewhere between 1% to 10% of an 8-hour workday or 40-hour workweek; a "moderate" limitation impairs performance somewhere between 11% to 20% of an 8-hour workday or 40-hour workweek; and a "marked" limitation impairs performance for more than 20% of an 8-hour workday or 40-hour workweek.

As to "understanding and memory," Dr. Stecker opined Plaintiff has moderate limitations in the ability to remember locations and work-like procedures and the ability to understand and remember short and simple instructions; and a marked limitation in the ability to understand and remember detailed instructions.  (AR 1255–56.)  In "sustained concentration and persistence," Dr. Stecker opined Plaintiff has mild limitations in the ability to carry out short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being unduly distracted by them, make simple work-related decisions, and complete a normal workday/workweek without interruptions from psychologically based symptoms; and moderate limitations in the ability to carry out detailed instructions, and sustain an ordinary routine without special supervision.  (AR 1256.)  In "functional limitations," Dr. Stecker opined Plaintiff has only mild limitations with respect to restriction of ADLs, difficulties in maintaining social functioning, and deficiencies of concentration, persistence, or pace.  (AR 1256–57.)  In all spaces provided to explain his findings as to each subset of mental functions, Dr. Stecker left the form blank.

Finally, Dr. Stecker checked boxes on the form indicating he opined Plaintiff's limitations

lasted 12 continuous months, and that drug and/or alcohol abuse is not a contributing factor

material to Plaintiff's disability.  (AR 1257.)  Dr. Stecker also opined Plaintiff would have good

and bad days; however, the portion of the form on which he was to estimate how many days per

month Plaintiff would likely be absent from work due to such "bad days," Dr. Stecker left blank.

The ALJ did not find Dr. Stecker's opinion to be persuasive:

> Dr. Stecker failed to provide any support for his opinion and he
> included only conclusions regarding functional limitations without
> any rationale for those conclusions.  The undersigned has found this
> evidence has little probative value because Dr. Stecker failed to cite
> to evidence to support his limitations.  However, it is noted that he
> indicated the claimant had only mild limitations in interacting with
> others and he did not indicate any anxiety/panic attacks as a
> symptom (Exhibit 5F/2).  In addition, his reporting of moderate
> limitations in remembering simple instructions or tasks is not
> supported by the consultative examination, intelligence testing, or
> her reporting of an ability to independently perform her activities of
> daily livings to the consultative examiner and the physical therapist.

(AR 26.)

3.    Analysis

a.    The ALJ Properly Evaluated Dr. Stecker's Opinion

The Court finds the ALJ's evaluation of Dr. Stecker's opinion is supported by and

consistent with the record.  As to the supportability factor, the ALJ rejected Dr. Stecker's opinion,

in part, because it included only conclusions regarding Plaintiff's functional limitations without

any rationale for those conclusions.  (AR 26.)  As previously noted, under each of the four

categories of mental limitations ((1) understanding, and memory; (2) sustained concentration, and

persistence; (3) social interactions; and (4) functional limitation), Dr. Stecker was invited to write

into the form the reasons in support of his findings, but instead he left the form blank.  As noted,

"the ALJ need not accept the opinion of any physician, including a treating physician, if that

opinion is brief, conclusory and inadequately supported by clinical findings."  Bray v. Comm'r

Soc. Sec. Admin, 554 F.3d 1219, 1228 (9th Cir. 2009) (quotation and citation omitted); Thomas,

278 F.3d at 957.  While an opinion cannot be rejected merely for being expressed as answers to a

check-the-box questionnaire, Popa v. Berryhill, 872 F.3d 901, 907 (9th Cir. 2017), the Ninth

Circuit has nevertheless held "the ALJ may permissibly reject check-off reports that do not

contain any explanation of the bases of their conclusions."  Ford, 950 F.3d at 1155 (citations omitted).  Thus, an ALJ may discount an unexplained check-the-box form opinion that is unsupported or inconsistent with the treatment records from that medical provider.  See id.; Flowers v. Colvin, No. 3:16-CV-05025 JRC, 2016 WL 4120048, at *3 (W.D. Wash. Aug. 3, 2016).  In addition, the ALJ indicated Dr. Stecker's opinion was not supported by his own findings, wherein Dr. Stecker opined Plaintiff has only mild limitations in her ability to interact with others and he did not identify anxiety/panic attacks as a symptom.  See Bray, 554 F.3d at 1228; Thomas, 278 F.3d at 957.  Based on the foregoing authorities, the ALJ's finding as to the supportability factor is appropriate.

Plaintiff disputes this finding by arguing that Dr. Stecker's opinion was supported by his own treatment notes; in support of this argument, Plaintiff identifies a single treatment note from September 2019.  (ECF No. 16-1 at 19 (citing AR 379–80).)  Plaintiff's argument is unavailing. As an initial matter, the Court notes there is no indication that Plaintiff was seen by Dr. Stecker in September 2019.  The identified treatment note indicates Plaintiff was seen and examined by Dr. Fan Mo, DO, not Dr. Stecker.  (See AR 377–80.)  Dr. Mo electronically entered the treatment note around 10:47 PDT (see AR 377, 379), and later discussed Plaintiff's case and plan with Dr. Stecker, who electronically signed off on the treatment note around 13:03 PTD (see AR 379). Regardless, a plain reading of this treatment note reveals it does not support Dr. Stecker's opinion regarding Plaintiff's limitations.  As discussed in greater detail *supra*, rather than affirm Plaintiff's allegations of disability due to memory issues, the progress note indicates normal examination findings, does not contain any cognitive test results, and indicates Dr. Mo had an "extensive discussion" with Plaintiff about starting to readjust herself to the working experience and "highly encouraged" Plaintiff to get ready to go back to work (and that Dr. Stecker signed off on this plan).  (Id.)  Further, while Plaintiff argues this note shows she had ongoing symptoms of depression, frustration, and memory problems (ECF No. 16-1 at 19), the progress note indicates the only potential basis for disability was depression, which was to be reevaluated two months later.  Plaintiff identifies no other treatment notes from Dr. Stecker that purportedly support his conclusions, nor is the Court aware of any in the record.  Accordingly, Plaintiff has not refuted

1    the ALJ's supportability finding with respect to Dr. Stecker's opinion.

2          As for the consistency factor, the ALJ found Dr. Stecker's opinion was inconsistent with

3    Dr. Swanson's consultative examination and intelligence testing, and Plaintiff's reporting of an

4    ability to independently perform her ADLs.  (AR 26.)  These, too, are valid reasons to discount a

5    treating physician's testimony.  See Andrews, 53 F.3d at 1041 (noting that inconsistency with

6    independent clinical findings in the record or another doctor's opinion is an appropriate reason to

7    reject a contradicted opinion of a treating physician); Lester v. Chater, 81 F.3d 821, 830–31 (9th

8    Cir. 1995); Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (inconsistencies with

9    evidence in the record support discounting a medical opinion).

10          Plaintiff disputes this finding by arguing Dr. Stecker's opinion is consistent with her own

11   testimony, in particular, Plaintiff's testimony that she tried to do volunteer work, but this caused

12   her to feel more frustration; and the medical record, particularly regarding the more recent notes

13   concerning Plaintiff's seizure disorder.  (ECF No. 16-1 at 19; AR 52–53.)  These arguments are

14   unavailing.  First, the ALJ reached an adverse credibility determination against Plaintiff, a

15   determination which this Court finds is supported by substantial evidence in the record (as

16   discussed in greater detail herein).  To the extent Plaintiff seeks to bolster the validity of Dr.

17   Stecker's opinion through reliance on her own testimony and allegations, the Ninth Circuit has

18   held an ALJ may properly discount an examiner's opinion that is based primarily on a claimant's

19   self-report of limitations.  See Ghanim v. Colvin, 763 F.3d 1154, 1162 (9th Cir. 2014) ("If a

20   treating provider's opinions are based to a large extent on an applicant's self-reports and not on

21   clinical evidence, and the ALJ finds the applicant not credible, the ALJ may discount the treating

22   provider's opinion") (internal citation omitted); see also Chaudry v. Astrue, 688 F.3d 661, 671

23   (9th Cir. 2012) (finding ALJ properly discounted examiner's opinion that was "based primarily

24   on [the claimant's] self-report of limitations"); Tommasetti, 533 F.3d at 1041 (same).  Second,

25   the Court is unpersuaded that Dr. Stecker's opinion is consistent with the medical notes regarding

26   Plaintiff's seizures.  As previously discussed, Plaintiff presented to the ER on three occasions in

27   2020 reporting seizures.  On each occasion, her examination post-seizure was unremarkable and

28   she was not admitted.  Furthermore, the medical record supports the ALJ's finding that Plaintiff's

seizures were effectively treated with medication.  As such, the seizure records are not consistent with an opinion of debilitating mental impairments.  Nonetheless, even though she discounted Dr. Stecker's opining of "moderate" limitations in memory, the ALJ still ultimately applied limitations in the RFC to address Plaintiff's purported limitations in her ability to understand, remember or apply information, by limiting Plaintiff to no exposure to hazards and no more than occasional changes in the work routine.

To the extent Plaintiff seeks to present an alternative interpretation of her testimony and the medical notes concerning her seizures, she is reminded that where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the ALJ.  Drouin v. Sullivan, 966 F.2d 1255, 1258 (9th Cir. 1992); Burch, 400 F.3d at 679.  Here, the ALJ's conclusions were supported by substantial evidence, and the Court cannot say that her interpretation of the available evidence was not rational.  Shaibi v. Berryhill, 883 F.3d 1102, 1108 (9th Cir. 2017).  Thus, the Court will not disturb the ALJ's consistency finding regarding Dr. Stecker's opinion.

### b.        The ALJ Properly Evaluated Dr. Swanson's Opinion

The Court finds the ALJ's evaluation of Dr. Swanson's opinion is also supported by and consistent with the record.

As to the supportability factor, the ALJ noted Dr. Swanson administered a clinical interview and several mental cognitive function tests (in fact, he is the only doctor in the record to do so (compare AR 1214–21 with AR 42–43 (Plaintiff's testimony that no formal neurocognitive testing was ever performed)), and that this clinical evidence and test results support Dr. Swanson's opinion that Plaintiff is able to maintain concentration and relate appropriately to other in a job setting, handle funds in her own best interests, and understand, carry out, and remember simple instructions.   (AR 25–26.)   As to the consistency factor, the ALJ determined Dr. Swanson's opinion is consistent with Plaintiff's ADLs and the absence of mental health treatment.  The Court finds the ALJ's analysis of the supportability and consistency factors was appropriately considered and is based on substantial evidence from the record.  See Woods v. Kijakazi (Woods II), 32 F.4th 785, 792 (9th Cir. 2022).

Plaintiff disputes that Dr. Swanson's opinion is supported by and consistent with the record on the basis that Dr. Swanson rendered his opinion in December 2019, before Plaintiff started having seizures, and therefore fails to account for Plaintiff's impairments based on her alleged seizure disorder, a period Plaintiff characterizes as a "deterioration of her condition." (ECF No. 16-1 at 19.)  The Court finds this argument unpersuasive.  For the reasons previously discussed, the ALJ properly weighed the value of the clinical evidence, testing results and medical records, resolved ambiguities, and synthesized the medical evidence, Lingenfelter, 504 F.3d at 1042; Morgan, 169 F.3d at 603; Tommasetti, 533 F.3d at 1041–42, to determine that the limited medical evidence of Plaintiff's seizures (approximately 20 of the nearly 900 pages of medical records that concern three reported seizures occurring between February and April 2020), combined with evidence that such seizures are adequately treated through medication, does not support the existence of a completely disabling impairment.  Furthermore, the Court notes Plaintiff alleges her disability began on November 1, 2017, well before her first seizure occurred in February 2020.  In issuing his December 2019 opinion, Dr. Swanson considered the medical and non-medical evidence up to the date of his opinion; this portion of the record spans multiple years and constitutes the vast majority of the medical evidence submitted in support of Plaintiff's Social Security claim and thus the longitudinal history/record; Dr. Swanson's opinion is therefore highly relevant to the ALJ's synthesis of the entire record to reach a determination regarding Plaintiff's functional limitations.  For these reasons, the Court finds Plaintiff's argument that the ALJ improperly deemed Dr. Swanson's opinion to be somewhat persuasive, solely because it does not consider Plaintiff's seizures, is unavailing.

Finally, the Court notes Plaintiff argues Dr. Stecker's opinion should have been deemed more persuasive than Dr. Swanson's because Dr. Swanson was a "one-time examining consultant," whereas Dr. Stecker was a long-term treating physician. (ECF No. 16-1 at 19.)  In asserting this argument, it appears that Plaintiff seeks to apply the now-abrogated "treating source rule."  On such a basis, her argument is unavailing.  However, even to the extent Plaintiff is seeking to assert an argument under the "relationship with the claimant" factor set forth in the new regulations, 20 C.F.R. §§ 404.1520c(a), (c)(3), Plaintiff's argument is still unavailing.

Notably, the Court remains skeptical that the records demonstrate Dr. Stecker's treating physician relationship with Plaintiff was either lengthy or substantive, as Plaintiff's argument is conclusory and Plaintiff identifies no treatment notes to verify her contention that Dr. Stecker treated Plaintiff regularly, and therefore "saw how she functioned on a longitudinal basis … both before and after her injury." Furthermore, the ALJ is only required to explain how persuasive she finds a medical opinion based on the supportability and consistency factors; the ALJ is not required to explain how she considered the remaining factors where, as here, she is deciding among differing opinions that are not equally persuasive. See 20 C.F.R. §§ 404.1520c(b)(2)–(3). At bottom, the Court notes that Plaintiff's argument pertains to neither the supportability nor consistency factor, and her conclusory assertion that Dr. Stecker maintained a more significant relationship with Plaintiff than any other doctor is unpersuasive. For these reasons, Plaintiff's argument is unavailing.

In sum, the ALJ's analysis addressed the persuasiveness of the medical opinions—including those of Drs. Swanson and Stecker—as well as the prior administrative medical findings, and the cumulative medical and non-medical evidence, and that analysis is supported by substantial evidence in the record. Ford, 950 F.3d at 1154; Martinez V., 2021 WL 1947238, at *3. Accordingly, the Court finds the ALJ did not err in her evaluation of the medical opinion evidence.

**B.  Plaintiff's Subjective Symptom Testimony**

Plaintiff testified that she became unable to work beginning in 2018 due to shock from the head injury and trauma; she tried to get stable into 2019 but things did not get better. (See AR 50.) As a result of the assault, Plaintiff alleges disability based on a traumatic brain injury, memory loss, and depression. (AR 270.) More specifically, Plaintiff claims her impairments cause difficulty in walking, talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others; stress or changes in routine. Plaintiff alleges she cannot drive, she has frequent absence-type seizures (even though the grand mal seizures are controlled with medication), she is unstable emotionally, loses things, yells at others, forgets to turn off the stove, and has significant irritability and sleepiness because of her seizure

medications.  (ECF No. 16-1 at 23; see AR 50–51, 55–60, 301–02.)  Plaintiff also testified she has extreme anxiety, she does not trust anyone, and she is very uncomfortable around crowds. Plaintiff argues the ALJ did not present clear and convincing reasons to discount this testimony. (ECF No. 16-1 at 20–25.)

    1.    Legal Standard

The ALJ is responsible for determining credibility,[9] resolving conflicts in medical testimony, and resolving ambiguities.  Andrews, 53 F.3d at 1039.  A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); SSR 16-3p; see also Orn, 495 F.3d at 635 ("An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment.").

Rather, an ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014); Smolen, 80 F.3d at 1281; SSR 16-3p, at *3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  Garrison, 759 F.3d at 1014; Smolen, 80 F.3d at 1281–82. If the claimant satisfies the first step and there is no evidence of malingering, "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."  Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citations omitted).

> If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive.  The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints. In this regard, questions of credibility and resolutions of conflicts in the testimony are functions solely of the Secretary.

Valentine v. Astrue, 574 F.3d 685, 693 (9th Cir. 2009) (quotation omitted); see also Lambert, 980 F.3d at 1277.

---

[9] SSR 16-3p applies to disability applications heard by the agency on or after March 28, 2016.  Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities."  SSR 16-3p, at *1-2.

Subjective pain testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence."  See Vertigan, 260 F.3d at 1049 ("The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it."); see also 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").  Rather, where a claimant's symptom testimony is not fully substantiated by the objective medical record, the ALJ must provide an additional reason for discounting the testimony.  See Burch, 400 F.3d at 680–81; see also Stobie v. Berryhill, 690 Fed. App'x 910, 911 (9th Cir. 2017) (finding ALJ gave two specific and legitimate clear and convincing reasons for rejecting symptom testimony: (1) insufficient objective medical evidence to establish disability during the insured period and (2) symptom testimony conflicted with the objective medical evidence).

Nevertheless, the medical evidence "is still a relevant factor in determining the severity of [the] claimant's pain and its disabling effects."  Burch, 400 F.3d at 680–81; Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).  Indeed, Ninth Circuit caselaw has distinguished testimony that is "uncorroborated" by the medical evidence from testimony that is "contradicted" by the medical records, deeming the latter sufficient on its own to meet the clear and convincing standard.  See Hairston v. Saul, 827 Fed. App'x 772, 773 (9th Cir. 2020) (quoting Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1160 (9th Cir. 2008) (affirming ALJ's determination claimant's testimony was "not entirely credible" based on contradictions with medical opinion)) ("[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); see also Woods v. Comm'r of Soc. Sec. (Woods I), No. 1:20-cv-01110-SAB, 2022 WL 1524772, at *10 n.4 (E.D. Cal. May 13, 2022) ("While a *lack* of objective medical evidence may not be the sole basis for rejection of symptom testimony, inconsistency with the medical evidence or medical opinions can be   sufficient." (emphasis in original)).

Additional factors an ALJ may consider include the location, duration, and frequency of

the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; conflicts between the claimant's testimony and the claimant's conduct—such as daily activities, work record, or an unexplained failure to pursue or follow treatment—as well as ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, internal contradictions in the claimant's statements and testimony, and other testimony by the claimant that appears less than candid.  See Ghanim, 763 F.3d at 1163; Tommasetti, 533 F.3d at 1039; Lingenfelter, 504 F.3d at 1040; Smolen, 80 F.3d at 1284.  Thus, the ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of her symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record.  SSR 16-3p, at *5.

Finally, so long as substantial evidence supports the ALJ's assessment of a claimant's subjective complaint, the Court "will not engage in second-guessing."  Thomas, 278 F.3d at 959.

### 2.   Analysis

As noted, the ALJ determined Plaintiff has the severe impairments of status posttraumatic brain injury/skull fracture and seizure disorder (AR 17), which Plaintiff has not challenged.[10]  As a result, the ALJ was required to make a credibility finding as to Plaintiff's own testimony. Valentine, 574 F.3d at 693; Lambert, 980 F.3d at 1277.  Because the ALJ made no finding that Plaintiff was malingering, she was required to give clear and convincing reasons as to why she did not find Plaintiff's subjective contentions about her limitations to be persuasive.  Id.

### a.   Inconsistencies with the Medical Record

One reason provided by the ALJ is that Plaintiff's allegations are unsupported by and

[10] In addition, the Court notes Plaintiff does not challenge the ALJ's determination at steps two and three with respect to which of Plaintiff's purported impairments were deemed "severe" and "not severe"; nor does Plaintiff challenge the ALJ's finding that Plaintiff did not meet or equal any Listing; that Plaintiff did not meet the paragraph B or C criteria; or that Plaintiff's impairments under the paragraph B criteria either did not limit her at all, or only moderately limited her abilities under the four functional areas; nor has Plaintiff challenged the ALJ's consideration and implicit rejection of the lay witness testimony.  As such, any challenges to these particular issues are deemed waived.  Lewis, 236 F.3d at 517 n.13; see also Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003) (stating court "will not consider any claims that were not actually argued in appellant's opening brief" and will only "review … issues which are argued specifically and distinctly in a party's opening brief.").

inconsistent with the medical record.  (AR 23–26.)  For example, the ALJ noted Plaintiff's allegations that her traumatic brain injury caused residual debilitating functional limitations was not supported by the vast majority of medical notes indicating Plaintiff's examinations yielded normal results, in which Plaintiff was always observed to be alert and fully oriented with no significant deficiencies in her memory, attention, fund of knowledge, or concentration abilities; Dr. Swanson's clinical interview yielded findings that Plaintiff had a cooperative attitude, normal speech, adequate concentration, general fund of knowledge, form and thought content, and Plaintiff's' short-term, recent, and remote memory were within normal limits.  Even during the interim after her discharge from the 2017 assault and initial hospitalization, the ALJ noted Plaintiff reported during her follow-up appointments that she was "doing well"; she denied any shortness of breath or chest pain and reported that she was not taking any medications; and she continued with follow-ups and her workups were unremarkable.  Indeed, the ALJ noted Plaintiff's neurologist reported Plaintiff had "good recovery" of the traumatic brain injury with no focal neurological deficits, and no cognitive test results were in the record; a follow up examination in November 2019 yielded no abnormal neurological findings.  Thus, the ALJ concluded the medical record demonstrated Plaintiff was experiencing a normal recovery from her injuries without complications, and her allegations of residual memory and functional limitations from the traumatic brain injury were not supported.

Plaintiff argues the ALJ did not identify any particular findings inconsistent with any of the specific functional deficits she described.  (ECF No. 16-1 at 21–22.)  The Court finds this argument is belied by the ALJ's in-depth discussion of the medical record and her noting of inconsistencies with Plaintiff's allegations, as discussed.  In addition, Plaintiff's argument that the ALJ failed to identify any specific inconsistencies with the specific functional deficits Plaintiff described somewhat misses the mark, as inconsistencies *with specific allegations of limitations* is merely one method the ALJ may utilize in evaluating a claimant's subjective testimony.  As previously noted, the ALJ may also employ ordinary techniques of credibility evaluation, such as considering internal contradictions in the claimant's statements and testimony and other testimony by the claimant that appears less than candid.  See Ghanim, 763 F.3d at 1163;

1   Tommasetti, 533 F.3d at 1039; Lingenfelter, 504 F.3d at 1040; Smolen, 80 F.3d at 1284.  In fact,

2   the ALJ does identify such additional reasons in her decision, as discussed herein.

3            **b.        Activities of Daily Living ("ADLs")**

4            Another reason the ALJ identified was that Plaintiff's ADLs do not support her allegations

5   of debilitating symptoms.   (AR 22.)   The ALJ noted Plaintiff reported on a function report

6   submitted in December 2019 that she reads self-help books, prepares simple meals, spends time

7   with her teenage son, washes dishes, helps with the laundry, sweeps, walks, listens to music,

8   watches movies, and occasionally attends church (id. (citing AR 296–303)); she reported that she

9   is able to attend to her own personal care, even though she gets "frustrated a lot with confusion"

10  (id. (citing AR 51–53, 57–58)); she reported to Dr. Swanson in December 2019 that she was

11  independent in all her ADLs and she was able to take walks, cook, go shopping, listen to music,

12  and watch television (id. (citing AR 1215–16)); and she reported in June 2020 that she lived with

13  her boyfriend and she was providing for her own needs in all ADLs (id. (citing AR 1248)).  The

14  ALJ noted Plaintiff's mother also reported Plaintiff has no difficulty with personal care and she is

15  able to prepare simple meals, clean, cook, do laundry, iron, shop in stores with someone, and

16  spend time with family.  (Id. (citing AR 304–11).)  The ALJ concluded these ADLs demonstrate

17  Plaintiff's ability to interact with others appropriately, be around the public, concentrate,

18  complete tasks, control behavior, adapt to social situations, and understand, remember and apply

19  information.   Accordingly, the ALJ concluded Plaintiff's allegations as to the intensity and

20  limiting effects of her impairments are inconsistent with her ADLs.  This finding constitutes a

21  clear and convincing reason to support the ALJ's credibility determination.  Molina v. Astrue,

22  674 F.3d 1104, 1112–13 (9th Cir. 2012), superseded by regulation on other grounds; Valentine,

23  574 F.3d at 693.

24           Plaintiff argues the ALJ "parsed and conflated" her testimony regarding her ADLs, did

25  not describe any ADLs which are actually performed in a manner inconsistent with the limitations

26  Plaintiff described, and therefore failed to establish through Plaintiff's ADLs that she is capable

27  of working a full day.  (ECF No. 16-1 at 22–23.)  These arguments are unavailing.

28           The Court has reviewed the record and finds the ALJ did not misconstrue either Plaintiff's

allegations and testimony, or any of the medical records in her discussion of Plaintiff's subjective testimony. Plaintiff's assertion that the ALJ "parsed and conflated" her testimony is therefore unfounded. Rather, Plaintiff's argument, at most, constitutes an attempt to present an alternative interpretation of the evidence. As previously noted, this is not sufficient to establish reversible error and the Court "will not engage in second-guessing." Thomas, 278 F.3d at 959; Ford, 950 F.3d at 1154; Burch, 400 F.3d at 679.

Plaintiff's argument that the ALJ failed to establish through the ADLs that she was capable of working a full day impermissibly attempts to shift the burden of proof of nondisability to the ALJ; whereas, it is the claimant's burden at steps one through four to establish her disability. Ford, 950 F.3d at 1148. Furthermore, Ninth Circuit caselaw demonstrates that ADLs may be grounds for discounting allegations that an impairment is so severe it is totally debilitating, even if they are not directly transferrable to a work setting. See Molina, 674 F.3d at 1112–13 (noting "the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferrable to a work setting … Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.") (internal citations omitted). Thus, Plaintiff's argument is unavailing.

Relatedly, Plaintiff's argument that the ALJ did not identify any specific inconsistent allegations of limitations is also unavailing. As noted, "[e]ngaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." Ghanim, 763 F.3d at 1165. In order to reach such a conclusion, the Ninth Circuit generally requires the ALJ to describe the daily activities, note whether the claimant performs them alone or with assistance, and evaluate whether the nature of each activity "comprise[s] a 'substantial' portion of [the claimant's] day, or [is] 'transferrable' to a work environment." Id. However, even where a claimant's activities "suggest some difficulty functioning, they may [still] be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Molina, 674 F.3d at 1112–13 (citing Turner, 613 F.3d at 1225; Valentine, 574 F.3d at 693).

In <u>Valentine v. Astrue</u>, for example, the ALJ determined the claimant "demonstrated better abilities than he acknowledged in his written statements and testimony" and that his "non-work activities … are inconsistent with the degree of impairment he alleges." <u>Valentine</u>, 574 F.3d at 693.   The ALJ further remarked on the claimant's ADLs, but acknowledged these activities did not suggest that the claimant could return to his old job. <u>Id.</u>   Instead, the ALJ indicated she thought the ADLs suggested the claimant's later claims about the severity of his limitations were exaggerated. <u>Id.</u>   The Ninth Circuit found the ALJ provided clear and convincing reasons to reject the claimant's subjective complaint testimony because she identified evidence that directly contradicted the claimant's claims that his PTSD was so severe that he was unable to work, including contentions about how debilitating his fatigue was. <u>Id.</u>   Thus, as demonstrated, evidence of ADLs need not directly contradict or disprove a specific alleged limitation, but may cut against the ultimate claim of disability based on the allegation that impairments are "totally debilitating."

Similarly, here, the ALJ acknowledged Plaintiff's impairments and found that the functional limitations in concentration, understanding, and memory caused by Plaintiff's impairments prevent her from returning to her prior work as a pharmacy technician, data examination clerk, or general clerk.   (AR 26); <u>Valentine</u>, 574 F.3d at 693.   Accordingly, the ALJ provided for additional limitations—such as requiring no exposure to hazards or dangerous conditions, only simple tasks that can be learned in one month or less, no fast-paced production, and no more than occasional changes in the work routine or setting—to be included in the RFC determination.   (AR 20.)   However, the ALJ concluded Plaintiff's ADLs did not demonstrate debilitating symptoms.   This finding is sufficient to establish an inconsistency with the alleged severity of Plaintiff's symptoms and therefore supports the ALJ's credibility determination. <u>Molina</u>, 674 F.3d at 1112–13; <u>Valentine</u>, 574 F.3d at 693.

**c.   Inconsistent Reporting/Other Reasons**

The ALJ also acknowledged Plaintiff testified that, since the alleged onset date, she has tried to cook and do things but she needs assistance because she would leave the stove on or leave the milk out; that now she cannot do anything by herself and always needs assistance to do

normal ADLs; that now she does not go for walks by herself because of her seizures; and that she needs help with dressing.  (AR 22.)  However, the ALJ determined that, "even if the claimant's daily activities have truly become as limited as she testified, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons …."  (Id.)

Importantly, the ALJ found Plaintiff's reporting was inconsistent.  The ALJ noted that, despite Plaintiff's testimony in support of her argument that her condition "deteriorated" after the seizures started in February 2020 (see ECF No. 16-1 at 19; AR 21–22), Plaintiff reported in June 2020, after her seizures began, that she lived with her boyfriend and she was providing for her own needs in all activities of daily living.  (AR 22 (citing AR 1248).)  The ALJ also noted that Plaintiff's testimony of requiring assistance in all of her ADLs due to her seizures is inconsistent with her report to Dr. Swanson in December 2019 (prior to her seizures) that she was independent in her ADLs as well as her report to her physical therapist in June 2020 (after her seizures began) that she was independent in her ADLs.  (AR 25.)

The ALJ also discussed Plaintiff's submission of a "log of seizures" (AR 351), which Plaintiff testified she typed up all at once and then went back to correct any mistakes (AR 64–67).  (AR 24–25.)  Plaintiff's "log" reports 13 seizures from February 15, 2020 through August 3, 2020: "grand mal seizures" on February 15 and 17, May 14, and August 3, 2020; "moderate" seizures on March 25 and 29, and April 15 and 25, 2020; and "minor/mild" seizures on June 1 and 15, and July 7 at 13, 2020.  Plaintiff does not explain how she recalled (not contemporaneously) the dates and details of her recorded seizures or how she distinguished her classifications of the types of seizures; she acknowledged she did not go to the hospital for any of the purported seizures, but asserted paramedics checked her out and determined she was fine.  The ALJ noted Plaintiff's self-generated seizure log report was not corroborated by any medical notes in the record (e.g., no paramedics records or medical treatment notes in which Plaintiff reported experiencing seizures in addition to the three reported at the ER); however, "even if [Plaintiff's] log of seizures is accurate" the ALJ noted Plaintiff only reported five grand mal seizures and none since September 2020, which supports grand mal seizures are controlled with medication.  (AR 24.)   The ALJ also noted Plaintiff's log was inconsistent with her own

testimony that she still has small seizures every two days; and her testimony was also inconsistent with a June 2020 medical note, in which Plaintiff reported that her last seizure was about two weeks prior, not that she was having them every other day.

Similarly, the ALJ noted Plaintiff testified at the February 17, 2021 hearing that she has continued to see her neurologist approximately every two months and has seen him ten or twelve times, but there are no medical records showing any appointments (or other treatment) after June 2020.[11]   (AR 22, 24–25, 39.)   Further, the ALJ noted that, at the hearing, Plaintiff's attorney vehemently indicated that his request for information from "the neurologist" was current as of January 2021, and that all medical records had been provided to the ALJ.  (AR 22, 24–25, 39–40, 53–55.)

In another example, the record establishes Plaintiff has a history of substance abuse, with Plaintiff reporting that she used to be a "very heavy drinker" and would experience DTs with alcohol withdrawal;[12] and has been in jail, but never a psychiatric hospital.  (AR 18, 1215–16.) The ALJ noted Plaintiff told Dr. Swanson in December 2019 that she had been sober since September 8, 2018, but she later testified at the hearing that she has been sober only since June 1, 2019.[13]   (AR 18 (citing AR 61–62).)  Plaintiff also testified that her drinking has not contributed in any significant way to her ability to get back to working, and that her symptoms are caused solely by her alleged residual brain injury impairments, explaining "I think it's completely all my injury.  Because before I got injured, I would drink heavily, and I worked fine.  And not I'm sober and there's—you know, with alcohol there's—it's out of the way and out of my life, but I'm still getting seizures and I'm still getting setbacks.  So, I don't think alcohol has anything to do with

---

[11] The Court additionally notes it is unaware of treatment notes in the record authored by Dr. Stecker, or otherwise indicating Plaintiff was seen by Dr. Stecker anywhere near the number of times to which she testified.

[12] "DT" stands for delirium tremens, which is considered one of the most severe manifestations of alcohol withdrawal.  It occurs after a period of heavy drinking, typically in those with a history of chronic alcohol use and those who have previously experienced severe alcohol withdrawal symptoms.  It is considered a rare, life-threatening condition.  DT symptoms range in severity and may include agitation, aggression, or irritability; confusion; trembling, sweating, tachycardia, nausea, and vomiting; impaired consciousness; visual, tactile, or auditory hallucinations; and tremors or seizures.  See Delirium Tremens: Symptoms, Timeline & Treatment (americanaddictioncenters.org) (last visited Dec. 22, 2022).

[13] However, the Court also notes Plaintiff acknowledged at the hearing that she achieved sobriety at various points, but then lost it again, noting she was recently sober for about eight months and then started drinking again.  (AR 62.)

1  it."  (See AR 62–63.)  In noting the established record of Plaintiff's DTs, the ALJ appears to

2  express some skepticism as to Plaintiff's causal testimony, and suggests the effects of Plaintiff's

3  alcohol use may present an "other reason" for Plaintiff's symptoms.  (See AR 18.)

4       In yet another example, as to Plaintiff's allegations that she cannot drive due to her

5  seizures (ECF No. 16-1 at 23), the ALJ notes Plaintiff testified that she previously had a driver's

6  license but it was suspended due to unpaid parking tickets in 2017, prior to her assault.  (AR 22

7  (citing AR 45).)  The Court further notes Plaintiff's testimony that her license was suspended due

8  to unpaid parking tickets is inconsistent with her report to the consultative examiner that she got

9  two DUIs and her license was suspended due to DUI.  (See AR 1215–16.)  In her decision, the

10  ALJ notes Plaintiff testified that she never obtained a new license, post-suspension, because she

11  "didn't know how to obtain it or what to do to get it back" (see AR 45), and suggests this, too,

12  supports an "other reason" for Plaintiff's symptoms.

13       Plaintiff does not substantively address the prior statement inconsistencies or "other

14  reasons" identified by the ALJ; therefore, she has not refuted this basis for the ALJ's adverse

15  credibility determination.

16       **d.      Conservative Treatment/Failure to Pursue Treatment**

17       Evidence that a claimant's medical treatment was relatively conservative may properly be

18  considered in evaluating a claimant's subjective complaints.  See Tommasetti, 533 F.3d at 1039–

19  40; Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is

20  sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation

21  omitted).  "Impairments that can be controlled effectively with medication are not disabling for

22  the purpose of determining eligibility for SSI benefits."  Warre v. Comm'r of Soc. Sec. Admin.,

23  439 F.3d 1001, 1006 (9th Cir. 2006).  Further, "[t]he ALJ is permitted to consider lack of

24  treatment in his credibility determination."  Burch, 400 F.3d at 681; see also Molina, 674 F.3d at

25  1114 (claimant's failure to assert a good reason for not seeking treatment can cast doubt on the

26  sincerity of the claimant's pain testimony, as can a failure to seek psychiatric treatment until after

27  the claimant applies for disability benefits); Stenberg v. Comm'r Soc. Sec. Admin., 303 Fed.

28  App'x 550, 552 (9th Cir. 2008) (finding noncompliance with recommended treatments, such as

1    attending only half of scheduled therapies and refusing psychological counseling and continued

2    physical therapy, constituted substantial evidence in support of finding the claimant was not

3    entirely credible).

4          Here, the ALJ found Plaintiff's symptoms were not as limiting as she generally alleged

5    because Plaintiff's seizures were well-controlled with medication; though medication was

6    prescribed for her depression, she refused to take it; and she has never had/sought any mental

7    health treatment.  (AR 21–22.)  The aforementioned authorities support the ALJ's finding that

8    Plaintiff's overall treatment plan was conservative in nature.

9          In disputing the ALJ's finding, Plaintiff appears to concede the point that her prescribed

10   medications constitute a conservative treatment, and she does not dispute that she did not seek to

11   avail herself of mental health treatment; however, Plaintiff argues the ALJ failed to consider how

12   side-effects of her prescribed medications impacted her ability to function.  More specifically,

13   Plaintiff argues the ALJ noted Plaintiff's seizure medication controlled her seizures, but did not

14   consider whether the side effects of these medications resulted in additional limitations for

15   Plaintiff.  (ECF No. 16-1 at 24–25.)  This is a curious argument.  As previously discussed in

16   greater detail, the medical record demonstrates Plaintiff was prescribed Keppra for her seizures

17   upon her first visit to the emergency room to report a seizure; Plaintiff shortly returned to the ER

18   complaining of side effects of nausea and vomiting—and no other side effects—and her dosage

19   was reduced from 500 mg to 250 mg per day; Plaintiff returned later to the ER to report a seizure

20   after she had self-adjusted her medication; a period of medication titration appears to have

21   followed for a short period; and no further medication complications (or seizures) were reported

22   in any medical note after June 2020.  In sum, Plaintiff's only side effects appear to have occurred

23   at the time of initial prescription and did not continue once a proper dosage for Plaintiff was

24   established.  It is therefore unclear what medication side effects impacted Plaintiff's ability to

25   function that the ALJ should have considered.  See, e.g., Schneider, 433 Fed. Appx. at 509 (ALJ's

26   failure to address claimant's migraines was harmless because medical record did not support

27   finding that migraines would affect claimant's functioning at work).  Consequently, the Court

28   finds Plaintiff's argument unavailing.

1    Plaintiff also argues the ALJ improperly rejected her reason for not taking her prescribed
2    psychotropic medications for depression.   Plaintiff contends that, as a former pharmacy
3    technician who "knew everything about medicine," she did not want to take the prescribed
4    medication because of the potential side effects, "I just thought that they were going to make me
5    more foggy and more—I didn't want to be foggy, so I chose not to take them."  (AR 51; ECF No.
6    16-1 at 22.)  This argument is also unavailing.

7    As noted, the Ninth Circuit has held that "unexplained, or inadequately explained, failure
8    to seek treatment or follow a prescribed course of treatment … can cast doubt on the sincerity of
9    the claimant's [subjective symptom] testimony."   Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.
10   1989).  Further, as also noted by the Court, it is within the ALJ's province to resolve conflicts and
11   ambiguities in the record, and determine credibility.   Lingenfelter, 504 F.3d at 1042; Andrews, 53
12   F.3d at 1039.  Here, the ALJ appropriately synthesized the evidence, resolved the conflicts and
13   ambiguities in the record, and reached a credibility determination in which she rejected Plaintiff's
14   fear-of-potential-side-effects reason for refusing her anti-depression medication, on the basis that
15   Plaintiff did not seek any mental health treatment.  This reasoning is supported by Ninth Circuit
16   caselaw.  See Burch, 400 F.3d at 681 (affirming ALJ discrediting testimony due to lack of
17   consistent treatment; commenting on claimant's failure to attend physical therapy, chiropractor,
18   or do home exercises, "[t]hat [the claimant]'s pain was 'not severe enough to motivate [her] to
19   seek [these forms of] treatment, even if she sought some treatment, is powerful evidence
20   regarding the extent to which she was in pain.") (internal citations omitted).   In light of the
21   foregoing legal authorities, this Court also concludes the ALJ reasonably rejected Plaintiff's
22   purported rationale for refusing to take her prescribed psychotropic medication on the basis that,
23   if Plaintiff's condition was truly so extreme that she was afraid to go anywhere and could not be
24   around other people (as alleged), she would have been motivated to seek other options for mental
25   health treatment, such as psychotherapy.[14]  Plaintiff never attempts to resolve the inconsistencies

---

26   [14] In addition, the Court notes other conflicting evidence that supports the ALJ's rationale.  For example, Plaintiff's
27   purported fear of potential side-effects appears attenuated where she never even attempted to take the anti-depressant
     medication and determine whether she would personally experience such possible side-effects.  The credulity of
     Plaintiff's justification is further strained in light of the discrepancy between Plaintiff's refusal to take anti-depressant
28   medication and her immediate willingness to take her prescribed anti-seizure medication, despite its potential side

1  in her testimony, nor does she attempt to explain why she did not seek any alternative form of

2  mental health treatment.  The Court, therefore, finds her argument unavailing.

3        In sum, the ALJ has sufficiently identified multiple clear and convincing reasons in

4  support of her determination that Plaintiff's treatment is inconsistent with the severity of her

5  alleged symptoms.  Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014); S.S.R. 16-3p at *10.

6  While Plaintiff may seek to suggest an alternative interpretation of the evidence, this is not

7  sufficient to establish reversible error.  See Ford, 950 F.3d at 1154; Burch, 400 F.3d at 679

8  (citations omitted).  Accordingly, the Court finds the ALJ provided clear and convincing reasons

9  supported by substantial evidence for discounting Plaintiff's symptom testimony.

10       **C.      The ALJ's Step Five RFC Determination**

11       At previously noted, at step five, the Commissioner must "identify specific jobs existing

12  in substantial numbers in the national economy that [a] claimant can perform despite [his]

13  identified limitations."  Zavalin v. Colvin, 778 F.3d 842, 845 (9th Cir. 2015) (citation and internal

14  quotations omitted).  Where the testimony of a VE is used, the VE must identify a specific job or

15  jobs in the national economy having requirements that the claimant's physical and mental abilities

16  and vocational qualifications would satisfy.  20 C.F.R. § 404.1566(b); see Burkhart v. Bowen,

17  856 F.2d 1335, 1340 n. 3 (9th Cir. 1988).  Hypothetical questions posed to the VE must set out all

18  the limitations and restrictions of the particular claimant, as supported by the medical record.

19  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

20       Plaintiff argues the RFC determination is not supported by substantial evidence because

21  the ALJ improperly disregarded the limitations asserted in her testimony and assessed by Dr.

22  Stecker.  (ECF No. 16-1 at 25.)  However, this Court has determined the ALJ properly evaluated

23  the medical opinion evidence, including Dr. Stecker's opinions, and her adverse credibility

24  determination regarding Plaintiff's testimony was appropriately supported by substantial

25  evidence.   The instant step five argument merely rehashes Plaintiff's prior arguments and

26  therefore fails.  See Stubbs-Danielson, 539 F.3d at 1175–76 (rejecting a step five argument that

27

28  effects (moreover even after she did, in fact, experience negative side effects from the anti-seizure medication, she
    sought an appropriate dosage of the medication and continued to take it).

"simply restates" arguments about medical evidence and testimony); <u>Hairston</u>, 827 Fed. App'x at 773 (summarily rejecting claimant's arguments that RFC and step-five findings were unsupported by substantial evidence as "derivative of her preceding arguments addressed and rejected above."); <u>see also</u> <u>Embrey</u>, 849 F.2d at 423 (acknowledging there is no requirement that testimony for which the ALJ has provided specific and legitimate reasons to discount be included in the hypothetical given the VE).

## VI.

## CONCLUSION AND ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.    Plaintiff's appeal from the decision of the Commissioner of Social Security (ECF No. 16) is DENIED;

2.    Defendant's cross-motion for summary judgment (ECF No. 17) is GRANTED; and

3.    The Clerk of the Court is DIRECTED to enter judgment in favor of Defendant Commissioner of Social Security and against Plaintiff Jenina D. Mazon and close this case.

IT IS SO ORDERED.

Dated:   **December 28, 2022**    _____
                                    UNITED STATES MAGISTRATE JUDGE

37